IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs October 7, 2008

## STATE OF TENNESSEE v. J. C. FAIR and KREDERICK FAIR

**Direct Appeal from the Criminal Court for Shelby County**
**No. 04-02746     James C. Beasley, Jr., Judge**

_____

**No. W2007-00730-CCA-R3-CD  -  Filed August 14, 2009**

_____

Following a jury trial, Defendants, J. C. Fair and Krederick Fair, were convicted of aggravated robbery, a Class B felony. Each Defendant was sentenced as a Range II, multiple offender, to eighteen years. On appeal, both Defendants argue (1) that the evidence was insufficient to support their conviction of aggravated robbery; (2) that the trial court erred in denying Defendants' motions for a mistrial; and (3) the trial court erred in its instructions to the jury. Defendant J. C. Fair also argues on appeal that the trial court erred in denying his motion to dismiss the indictment against him on the basis of prosecutorial vindictiveness and that the trial court erred in certain evidentiary rulings. After a thorough review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

THOMAS T. WOODALL, J., delivered the opinion of the court, in which DAVID H. WELLES and J.C. MCLIN, JJ., joined.

Jerri D. Mauldin, Memphis, Tennessee, (on appeal) for the appellant, J. C. Fair; Jeff Woods, Memphis, Tennessee, (at trial) for the appellant, J. C. Fair; and James E. Thomas and Jason Poyner, Memphis, Tennessee, for the appellant, Krederick Fair.

Robert E. Cooper, Jr., Attorney General and Reporter; J. Ross Dyer, Assistant Attorney General; William L. Gibbons, District Attorney General; Colin Campbell, Assistant District Attorney General; and Michelle Parks, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

## I. Background

Evelyn Johnson testified that in July 2005 she was the property manager for the Lincoln Apartments in Memphis, and her responsibilities included collecting rents and leasing vacant apartments. Ms. Johnson stated that Defendant J. C. Fair lived with Quartisha Cotton who rented the apartment located at 1171 North Belvedere Boulevard. Defendant J. C. Fair, however, had not

signed the lease agreement with Ms. Cotton. Defendant J. C. Fair called Ms. Johnson on July 6, 2005, between approximately 11:00 a.m. and 11:30 a.m. Ms. Johnson was glad to hear from him and asked Defendant how he was doing. Defendant responded, "I'm okay," and asked Ms. Johnson if she was alone. Ms. Johnson acknowledged that she was by herself in the office, and Defendant told her he was going to come by to see her. Ms. Johnson did not think the exchange was unusual.

Ms. Johnson stated that the office was equipped with a wrought iron door which could only be unlocked from inside the office. Visitors to the office were monitored by a camera hooked up to a television, but the television's VCR had not yet been installed. Ms. Johnson said that many of the tenants, including Defendant, paid their rent in cash. Ms. Johnson kept the day's cash receipts in a green bag which she either placed in her purse or in the top drawer of her desk. Ms. Johnson said that on the day of the robbery, she had approximately $3,000 in cash.

Defendant knocked on the door approximately five to ten minutes after his telephone call, and Ms. Johnson let him in. Defendant gave Ms. Johnson one hundred dollars toward his overdue rental payment. Ms. Johnson wrote him a receipt and noticed on the television screen that someone was standing outside the office. Ms. Johnson stated the person was wearing a long gray jacket, a long skirt, and what appeared to be a purse strap over one shoulder. Ms. Johnson said that she thought the person was an old lady from the attire the person wore. Ms. Johnson said that she continued to talk to Defendant as she walked to the door and opened it, but Defendant never said anything. Ms. Johnson stated that as soon as she opened the door, a man pulled a scarf back revealing a gun, and he put the gun to her head. Ms. Johnson put her hands up in the air. The man said, "[W]ell you know what I'm here for, get your ass in your office."

Defendant was still sitting in his chair. Ms. Johnson began to back up, and Defendant stood up. Defendant told Ms. Johnson, "[L]et's go in the office, Evelyn." Ms. Johnson said that there was no interaction between Defendant and the man with the gun. The man took the deposit bag out of Ms. Johnson's purse, and then pointed the gun at Ms. Johnson. Ms. Johnson stated that Defendant moved in front of her and told the man that he was not going to let him hurt Ms. Johnson. The man made Defendant and Ms. Johnson go into the bathroom, and then he left through the office's back door with Ms. Johnson's purse and the deposit bag. Ms. Johnson said that she was very afraid during the incident.

Ms. Johnson stated that she was able to get a good look at the man's face before he pulled a scarf down over his head. At trial, Ms. Johnson identified Defendant Krederick Fair, Defendant J. C. Fair's brother, as the man with the gun.

Ms. Johnson called 911. When Defendant J. C. Fair returned to the office, Ms. Johnson told him that the police had warned her not to touch anything. Ms. Johnson said that Defendant J. C. Fair took his tee shirt off, wiped off the doorknob of the back door, and then closed the back door with his tee shirt. Ms. Johnson told the police about what Defendant J. C. Fair had done, but Ms. Johnson did not think anything about the incident at the time. Ms. Johnson gave a description of the perpetrator to the investigating officers. Ms. Johnson described the gun as "big" with a brown handle and a "banana clip." Ms. Johnson said that the gun was equipped with a sight, and that Defendant Krederick Fair had pulled the scarf back over the sight. The State introduced the AK-47

rifle later found in Ms. Cotton's apartment for identification purposes only. Ms. Johnson said that the rifle was similar to the one used in the robbery except the rifle introduced at trial was missing its stock and strap.

On July 7, 2005, Ms. Johnson received a telephone call from Ms. Cotton which prompted Ms. Johnson to call the police. Ms. Johnson rode with the police officers to Ms. Cotton's apartment which was her usual procedure when a tenant reported a problem. Ms. Cotton told Ms. Johnson that her front door had been kicked in. Ms. Johnson stated that the apartment had been ransacked. Ms. Johnson said that she screamed when the officers found a gun matching the one used by Defendant Krederick Fair during the robbery.

Ms. Johnson stated that there was an unobstructed crawl space above the apartments in the complex. Ms. Johnson stated that Defendant J. C. Fair was discovered by police officers in the crawl space above the apartment next to Ms. Cotton's apartment.

On cross-examination Ms. Johnson stated that she had known Defendant J. C. Fair approximately one and one-half years. Ms. Johnson said that she would join Defendant and the other residents to watch basketball on the clubhouse's television approximately twice a month. Ms. Johnson said that Defendant J. C. Fair "was [her] hero for the day," because he stepped in front of her when Defendant Krederick Fair raised his gun toward her. Ms. Johnson stated that Defendant J. C. Fair peeked into Ms. Johnson's office from the bathroom to see if the perpetrator had left the premises. Defendant J. C. Fair then ran out the back door after the perpetrator. Defendant J. C. Fair returned and told Ms. Johnson that the perpetrator had driven away in a green car.

Sergeant Dan Switzer took Ms. Johnson's statement on July 7, 2005. Ms. Johnson described the perpetrator as a slimly built African-American male, approximately five feet, seven inches to five feet, nine inches tall, and between twenty-five and thirty years old. Ms. Johnson also said that the perpetrator had "a big nose and a square face." Sergeant Switzer stated that he and his partner drove by the residence of Defendant Krederick Fair's girlfriend on July 8, 2005, and observed a man running from the apartment. Sergeant Switzer said that Defendant Krederick Fair turned himself in to the investigating officers two days later.

Officer Teresa Wortham, with the Memphis Police Department, was dispatched to the Lincoln Apartments on July 6, 2005, in response to Ms. Johnson's 911 call. Officer Wortham described Ms. Johnson as "hysterical, shaken up, crying." Officer Wortham learned that the perpetrator had recently left the premises and put out a broadcast with the information she had gathered to that point.

On cross-examination, Officer Wortham acknowledged that Ms. Johnson told her that the perpetrator appeared to be a woman, and that she only saw half of the perpetrator's face. Officer Wortham stated that she did not recollect Ms. Johnson saying that Defendant J. C. Fair had wiped the back door down with his tee shirt. Officer Wortham said that she interviewed Defendant J. C. Fair at the crime scene. According to Officer Wortham's report of the interview, Defendant J. C. Fair stated:

that he observed the male black with a mask over half his face pull out a large gun, shotgun, an AK-47, and demanded he and complainant get into the bathroom at which . . . time the witness advised he then jumped in front . . . of the complainant and stated I'm not going to let you hurt her."

Officer Wortham said that she was one of the officers dispatched to Ms. Cotton's apartment on July 7, 2005 at approximately 1:30 p.m. (before Ms. Cotton reported the break-in of her apartment). Officer Wortham said that Ms. Johnson was also present when she arrived. Officer Wortham stated that Defendant J. C. Fair was arrested and taken into custody. The other investigating officers searched the apartment but did not find a weapon. On redirect examination, Officer Wortham stated that she did not personally observe any of the investigating officers look under the mattress of Ms. Cotton's bed.

Officer Donald E. Fields, Jr., with the Memphis Police Department, was dispatched to 1171 North Belvedere at the Lincoln Apartments on July 7, 2005, based on a report that the suspect in the robbery on July 6, 2005, was hiding at that address. An African-American woman answered the door and initially told Officer Fields that she was alone. The woman then admitted that the suspect was hiding in the attic. The officers removed Defendant J. C. Fair from the attic and arrested him in connection with the robbery the day before.

Officer Fields stated that he was familiar with a semiautomatic AK-47. Officer Fields said that the weapon was usually equipped with a stock, but the stock could be removed. A sling could also be fastened to the gun, and the sling could be removed in approximately thirty seconds or less. Officer Fields stated that users of that type of weapon often used tape or padding to hold the weapon together when the stock was removed.

On cross-examination, Officer Fields said that he did not recollect why the report reflected that the officers were responding to "an armed party call." Officer Fields reiterated that the purpose of the call was to arrest a suspect in the robbery which occurred on July 6, 2005. Officer Fields said that he conducted a routine pat down search of Defendant J. C. Fair after he was arrested, but he had no present recollection of whether the other officers searched the apartment.

Officer Tyont Shabazz, with the Memphis Police Department, testified that he was dispatched to 1171 North Belvedere on a burglary call on July 7, 2005, after Defendant was arrested and taken into custody. The victim, Ms. Cotton, and the apartment complex's manager were waiting outside the apartment. Ms. Cotton told Officer Shabazz that someone had entered her apartment and stolen money and jewelry. Officer Shabazz stated that a search of the apartment revealed an AK-47 rifle, serial number AM304282, hidden between the mattress and box springs of a bed. Banana clips were found underneath the cushion of a chair in the living room. On cross-examination, Officer Shabazz stated that he did not detect signs of a forced entry into the apartment.

Officer Lavern Jones, with the Memphis Police Department, testified that he dusted Ms. Johnson's office for fingerprints but was unable to find any usable prints. Francis Carpenter testified that he was responsible for the chemical processing of evidence recovered by the Memphis Police Department. Mr. Carpenter stated that he was unable to isolate any fingerprints on the AK-47 rifle.

-4-

The State rested its case-in-chief, and Defendant Krederick Fair presented his defense. Officer Ken Fox, with the Memphis Police Department, testified that he responded to a dispatcher's call about an armed party or suspicious person at the Lincoln Apartments on July 7, 2005. Officer Fox stated that he met Ms. Johnson at her office. Officer Fox said that Ms. Johnson had been the victim of a robbery, and she provided the address of the apartment in which she believed the perpetrator of the robbery was hiding. Officer Fox knocked on the apartment door which was answered by an African-American woman. Officer Fox searched the interior of the apartment but did not find anyone. Eventually, he learned that the suspect, Defendant J. C. Fair, was hiding in the attic. Officer Fox talked Defendant J. C. Fair into surrendering, and he was arrested. On cross-examination, Officer Fox stated that he did not search between the mattress and boxsprings of the bed in the bedroom.

## II. Prosecutorial Vindictiveness

Relying on State v. Phipps, 959 S.W.2d 538 (Tenn. 1997), Defendant J. C. Fair argues that the trial court erred in denying his motion to dismiss the indictment against him on the basis of prosecutorial vindictiveness. Defendant J. C. Fair contends that his re-indictment on the greater charge of aggravated robbery after he decided not to accept the State's offer of settlement based on a charge of facilitation of aggravated robbery and after he had, in the State's view, testified unfavorably in an unrelated case, created a presumption of vindictiveness which the State failed to overcome by clear and convincing evidence.

At the hearing on Defendant J. C. Fair's motion to dismiss, the prosecutor stated that he was assigned the case after Defendant J. C. Fair had been indicted on the charge of facilitation of aggravated robbery. The prosecutor reviewed the file and concluded that the initial charge pursued by the previous prosecutor assigned to the case was erroneous in light of the theory of criminal responsibility. The prosecutor telephoned trial counsel and informed him that he was going to seek a new indictment on the charge of aggravated robbery. The prosecutor, however, told trial counsel that he would agree to settle the current charge in exchange for Defendant J. C. Fair's entry of a plea of guilty to facilitation of aggravated robbery, if Defendant J. C. Fair accepted the offer before the case was again presented to the grand jury. The prosecutor stated that Defendant J. C. Fair did not respond to the State's offer of settlement, and he was re-indicted for aggravated robbery.

The trial court found no evidence that the prosecutor acted in a vindictive manner. The trial court stated that:

> it appears to me in this case and [the prosecutor's] intention all along was to resubmit this and he gave [Defendant J. C.] Fair an opportunity to benefit himself of the lesser charge. He chose not to do that. So I don't see that this was done in a vindictive manner by [the prosecutor]. It appears to me that it was done based upon his evaluation of the case so I'm going to deny the motion to dismiss the indictment.

In North Carolina v. Pearce, 395 U.S. 711, 724-25, 89 S. Ct. 2072, 2080 (1969), the United States Supreme Court held that it is a violation of basic due process to punish a person because he had done what the law plainly allows. The defendant in Pearce successfully appealed his original

conviction and then later received a greater sentence after retrial and another conviction. While concluding that the Constitution does not bar the imposition of a more severe sentence after retrial, the Court held that the Due Process Clause of the Fourteenth Amendment prevents increased sentences which are actually or likely motivated by a vindictive desire to punish a defendant for the exercise of the right to appeal or collaterally attack his or her first conviction. Id. at 725. "The rule announced in Pearce has been interpreted to create a rebuttable presumption of vindictiveness which may be overcome only by objective information in the record which justifies the increased sentence." Phipps, 959 S.W.2d at 541 (citing United States v. Goodwin, 457 U.S. 368, 374, 102 S. Ct. 2485, 2489 (1982)).

Applying the analysis of Supreme Court precedent, the Phipps court held that:

even in the absence of proof of actual bad faith or malice, a rebuttable presumption of prosecutorial vindictiveness may arise if the circumstances of a case pose a "realistic likelihood" of prosecutorial retaliation. After a defendant has raised the issue of vindictiveness, the trial court must review the circumstances of record and decide whether the prosecutor's actions give rise to a realistic likelihood of prosecutorial retaliation. In assessing whether a "realistic likelihood" of prosecutorial retaliation exists, courts must consider whether the right asserted by the defendant would result in duplicative expenditures of prosecutorial resources, or require the State to do over again what it thought it had already done correctly once. Goodwin, 457 U.S at 383, 102 S. Ct. at 2494. When the circumstances demonstrate that the prosecutor has "a personal stake" or an interest in self vindication, or when institutional biases militate against retrial of a decided question, the balance weighs in favor of recognizing the presumption. Id. Likewise the presumption is especially warranted if the prosecutorial decision to increase the charge or sentence is made after an initial trial is completed rather than in a pretrial context. When application of these factors to the circumstances of a case reveal the existence of a realistic likelihood of prosecutorial retaliation, Pearce applies. The presumption is not, however, absolute. Once the presumption of vindictiveness has been raised, the burden shifts to the State to rebut it by presenting clear and convincing evidence which demonstrates that the prosecutor's decision was motivated by a legitimate purpose. Finally, in attempting to overcome the presumption, the prosecutor is not limited to evidence which arose after the original sentencing proceedings, so long as the evidence constitutes "objective information ... justifying the increased sentence." [Texas v.] McCullough, 475 U.S. [134], 142, 106 S. Ct. [976], 981 [1986], quoting Goodwin, 457 U.S. at 374, 102 S. Ct. at 2489.

Phipps, 959 S.W.2d at 546.

In Phipps, the defendant successfully appealed his conviction of first degree murder and was granted a new trial. The State did not seek the death penalty in the first trial. Upon remand, the State filed a notice of intention to seek the death penalty, and the defendant moved to strike the notice, arguing that principles of due process and double jeopardy precluded the State from seeking the death penalty when the State did not seek the death penalty at the initial trial. Id. at 539. The

trial court granted the defendant's motion, and the State appealed pursuant to Rule 9 of the Tennessee Rules of Appellate Procedure. Id. at 540. The Phipps court, after concluding that the circumstances of the case gave rise to a rebuttable presumption of vindictiveness, remanded the case for a hearing in which the State would be permitted to present evidence rebutting the presumption. Id. at 547.

Both Phipps and Pearce involved actions taken by the State after conviction and upon retrial during which the State sought to have a greater sentence imposed on the defendant. However, as recognized in Godwin and Phipps, there is a distinction between pre-trial and post-trial conduct on the part of the State. Godwin, 457 U.S. at 382; Pearce, 959 S.W.2d at 546. As the Supreme Court cautioned in Godwin:

> [t]here is good reason to be cautious before adopting an inflexible presumption of prosecutorial vindictiveness in a pretrial setting. In the course of preparing a case for trial, the prosecutor may uncover additional information that suggests a basis for further prosecution or he simply may come to realize that information possessed by the State has a broader significance. At this stage of the proceedings, the prosecutor's assessment of the proper extent of prosecution may not have crystallized. In contrast, once a trial begins-and certainly by the time a conviction has been obtained-it is much more likely that the State has discovered and assessed all of the information against an accused and has made a determination, on the basis of that information, of the extent to which he should be prosecuted. Thus, a change in the charging decision made after an initial trial is completed is much more likely to be improperly motivated than is a pretrial decision.

Godwin, 457 U.S. at 381, 102 S. Ct. at 2492.

In Bordenkircher v. Hayes, 434 U.S. 357, 98 S. Ct. 663 (1978), the defendant was indicted on the charge of uttering a forged instrument which was subject to a sentence range of between two and ten years. Id. at 359, 98 S. Ct. at 665. Plea negotiations commenced during which the State offered to recommend a sentence of five years in exchange for the defendant's plea of guilty. The State also informed the defendant that if he chose to proceed to trial, the State would return to the grand jury to seek an indictment under the Kentucky Habitual Criminal Act, which carried a mandatory sentence of life imprisonment, based on the defendant's two prior felony convictions. Id. at 358-59, 98 S. Ct. at 365. The defendant chose not to enter a plea of guilty, and the State obtained an indictment charging him under the Habitual Criminal Act. Id. at 359, 98 S. Ct. at 666. The Supreme Court noted that it was "not disputed that the recidivist charge was fully justified by the evidence, that the prosecutor was in possession of the evidence at the time of the original indictment, and that [the defendant's] refusal to plead guilty to the original charge was what led to his indictment under the habitual criminal statute." Id.

The Supreme Court observed that in Pearce "the Court was dealing with the State's unilateral imposition of a penalty upon a defendant who had chosen to exercise a legal right to attack his original conviction--a situation 'very different from the give-and-take negotiation common in plea bargaining between the prosecution and defense, which arguably possess relatively equal bargaining

power.'" Id. at 363, 98 S. Ct. at 668. The due process violation in cases such as Pearce "lay not in the possibility that a defendant might be deterred from the exercise of a legal right, but rather in the danger that the State might be retaliating against the accused for lawfully attacking his conviction." Id. (internal citations omitted). However, "in the 'give-and-take' of plea bargaining, there is no such element of punishment or retaliation so long as the accused is free to accept or reject the prosecution's offer." Id.

The Supreme Court concluded:

> [t]here is no doubt that the breadth of discretion that our country's legal system vests in prosecuting attorneys carries with it the potential for both individual and institutional abuse. And broad though that discretion may be, there are undoubtedly constitutional limits upon its exercise. We hold only that the course of conduct engaged in by the prosecutor in this case, which no more than openly presented the defendant with the unpleasant alternatives of forgoing trial or facing charges on which he was plainly subject to prosecution, did not violate the Due Process Clause of the Fourteenth Amendment.

Id. at 365, 98 S. Ct. at 669.

The original indictment, which often begins plea negotiations, "does not necessarily define the extent of the legitimate interest in prosecution. For just as a prosecutor may forgo legitimate charges already brought in an effort to save the time and expense of trial, a prosecutor may file additional charges if an initial expectation that a defendant would plead guilty to lesser charges proves unfounded." Goodwin, 457 U.S. at 380, 102 S. Ct. at 2492.

In the case sub judice, Defendant was initially indicted on the charge of facilitation of aggravated robbery. The prosecutor assigned to the case was changed, and after his review, the newly assigned prosecutor decided that the circumstances of the case supported an indictment of aggravated robbery under a theory of criminal responsibility. The prosecutor informed Defendant's trial counsel that he intended to seek re-indictment for the greater charge but extended Defendant the opportunity to enter a plea of guilty to the lesser charge. Defendant chose to proceed to trial, and the prosecutor obtained the new indictment. The Bordenkircher Court "made clear that the mere fact that a defendant refuses to plead guilty and forces the government to prove its case is insufficient to warrant a presumption that subsequent changes in the charging decision are unjustified." Goodwin, 457 U.S. at 383, 102 S. Ct. at 2493.

Based on our review, we conclude that the circumstances of the case do not "pose a 'realistic likelihood' of prosecutorial retaliation" which would give rise to a presumption of prosecutorial vindictiveness. Pearce, 959 S.W.2d at 546. Because the presumption is not applicable, for us to find prosecutorial vindictiveness in this pretrial context, Defendant would have to prove actual vindictiveness. Goodwin, 457 U.S. at 384, 102 S. Ct. at 2494.

Neither at the hearing on his motion to dismiss nor in his brief on appeal does Defendant point to any vindictiveness on the part of the State other than a general statement, without specificity

or context, that Defendant testified "unfavorably" in an unrelated trial and that the State obtained a new indictment on the charge of aggravated robbery. Without more, we conclude that Defendant has failed to show actual vindictiveness of the part of the State. Defendant J.C. Fair is not entitled to relief on this issue.

## III. Motion to Suppress

Defendant J. C. Fair argues that the trial court erred in denying his motion to suppress the AK-47 rifle found in Ms. Cotton's apartment as a result of a warrantless search of the apartment. Defendant apparently contends that because Ms. Cotton was not called to testify at trial, the State failed to establish that the search was consensual. Alternatively, Defendant submits that the search violated Fourth Amendment principles because the extent of the search, that is, finding the rifle under the mattress and the banana clips under a chair cushion, exceeded the scope of the consent to search.

At the suppression hearing, Officer Shabazz testified that he responded to a dispatcher's call concerning a burglary at 1171 North Belvedere Boulevard on July 7, 2005. Officer Shabazz met Ms. Cotton, the victim, who told him that her home had been broken into and that money and jewelry had been taken. Officer Shabazz proceeded to process the crime scene which involved looking for anything the perpetrator might have left behind. Officer Shabazz stated that Ms. Cotton was present during the search and never put any limitation on the search. Officer Shabazz found an AK-47 rifle between the mattress and box springs of a bed. Officer Shabazz stated that he did not initially know the relevance of the rifle until he walked outside with the rifle, and Ms. Johnson said, "That's the gun."

On cross-examination, Officer Shabazz said that the mattress was pushed back on the box springs and was "off center." Officer Shabazz acknowledged that the rifle was not visible until the mattress was lifted up. Officer Shabazz asked Ms. Cotton if she owned the rifle, and Ms. Cotton said that it belonged to her boyfriend. Officer Shabazz checked the serial number of the rifle and determined that it had been stolen. Officer Shabazz said that Ms. Cotton told him that Defendant J. C. Fair had been arrested earlier that day for the robbery of Ms. Johnson. Ms. Cotton said that her home was burglarized while she was at the police station giving a statement about the incident. Officer Shabazz did not have a present recollection of whether he learned about Defendant J. C. Fair's arrest before or after the AK-47 rifle was found.

At the conclusion of the suppression hearing, the trial court found that Ms. Cotton, as homeowner, voluntarily consented to the search of the apartment and denied Defendant's motion to suppress.

Under both the Fourth Amendment to the United States Constitution and Article I, Section 7 of the Tennessee Constitution, a warrantless search of a person's home is presumed unreasonable unless the search falls within one of the narrowly defined exceptions to the warrant requirement. State v. Bartram, 925 S.W.2d 227, 229-230 (Tenn. 1996) (citing Coolidge v. New Hampshire, 403 U.S. 443, 454-455, 91 S. Ct. 2022, 2032 (1971)). A well-settled exception to the warrant requirement is a search conducted pursuant to a voluntary and intelligent consent either by the

individual whose property is searched, Bartram, 925 S.W.2d at 230 (citing Schneckloth v. Bustamonte, 412 U.S. 218, 222, 93 S. Ct. 2041, 2045 (1973)), or by a third party who possesses common authority over the premises, id. at 230-231 (citing United States v. Matlock, 415 U.S. 164, 171, 94 S. Ct. 988, 993 (1974)). The State has the burden of establishing that the search was conducted pursuant to this exception. Id. If the State fails to satisfy its burden, the exclusionary rule may operate to bar the admissibility of any evidence obtained directly or derivatively from the unconstitutional search. Wong Sun v. United States, 371 U.S. 471, 485, 83 S. Ct. 407, 416 (1963); State v. Clark, 844 S.W.2d 597, 600 (Tenn. 1992).

For consent to pass "'constitutional muster,'" it must be "'unequivocal, specific, intelligently given, and uncontaminated by duress or coercion.'" State v. Simpson, 968 S.W.2d 776, 784 (Tenn. 1998) (quoting State v. Brown, 836 S.W.2d 530, 547 (Tenn.1992)). The question of whether a particular consent to search was "voluntary" is fact-specific to each case. State v. Cox, 171 S.W.3d 174, 185 (Tenn. 2005). In evaluating the voluntariness of consent, factors to consider may include (1) the time and place of the encounter; (2) whether the encounter was in a public or secluded place; (3) the number of officers present; (4) the degree of hostility; (5) whether weapons were displayed; (6) whether consent was requested; and (7) whether the consenter initiated contact with the police. Id. (citing 79 C.J.S. Searches and Seizures § 119(b) (1995 & Supp. 2004); State v. Carter, 16 S.W.3d 762, 769 (Tenn. 2000)).

"[T]he consent of one who possesses common authority over premises or effects is valid as against the absent, non-consenting person with whom that authority is shared." State v. Bartrum, 925 S.W.2d 227, 230-31 (Tenn. 1996) (citing United States v. Matlock , 415 U.S. at 171, 94 S. Ct. at 993). The United States Supreme Court has defined common authority as the "mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched." Matlock, 415 U.S. at 171 n.7, 94 S. Ct. at 993 n.7.

This court has previously concluded that valid consent exists if (1) the third party in fact had common authority or (2) a reasonable person, given the facts and circumstances available to the police, would have concluded "that the consenting party had authority over the premises." State v. Ellis, 89 S.W.3d 584, 593 (citing Illinois v. Rodriguez, 497 U.S. 177, 188-89, 110 S. Ct. 2793, 2801 (1990)).

On review, an appellate court may consider the evidence adduced at the suppression hearing as well as at trial in determining whether the trial court properly denied a pretrial motion to suppress. State v. Henning, 975 S.W.2d 290, 297-99 (Tenn. 1998). A trial court's factual findings on a motion to suppress are conclusive on appeal unless the evidence preponderates against them. State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996); State v. Jones, 802 S.W.2d 221, 223 (Tenn. Crim. App. 1990). Questions about the "credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." Odom, 928 S.W.2d at 23. The application of the law to the facts as determined by the trial court is a question of law which we review de novo on appeal. State v. Yeargan, 958 S.W.2d 626, 629 (Tenn. 1997).

At trial, Ms. Johnson testified that Defendant J. C. Fair had not signed the lease agreement with Ms. Cotton, but he lived with Ms. Cotton, and it appears from the record that Defendant J. C. Fair contributed to the rental payments. Ms. Cotton's name, however, was listed on the rental agreement with the apartment complex as the lessee, and Ms. Johnson testified that Ms. Cotton considered the apartment her home even when Defendant J. C. Fair was not present. We conclude that Ms. Cotton had "common authority" over the apartment.

Officer Shabazz testified at the suppression hearing that Ms. Cotton initiated the contact with the police officers, and he responded to Ms. Cotton's report of a burglary at her home. Ms. Cotton met Officer Shabazz in front of the apartment and allowed Officer Shabazz to enter the premises. Ms. Cotton was present as Officer Shabazz searched the apartment for anything the burglar might have left behind. There is nothing in the record to indicate any hostility or display of weapons. Based on our review of the totality of the circumstances, we conclude that the evidence does not preponderate against the trial court' s finding that Ms. Cotton voluntarily consented to the search of her apartment.

A search, however, must not exceed the scope of the consent given. State v. Watson, 227 S.W.3d 622, 644 (Tenn. Crim. App. 2006). "Any express or implied limitations regarding the time, duration, area, or intensity of police activity necessary to accomplish the stated purpose of the search and the express object of the search are relevant considerations in determining the scope of the consent to search." Id. (citing Florida v. Jimeno, 500 U.S. 248, 251, 111 S. Ct. 1801 (1991)). "The scope of consent is not based on the subjective intentions of the consenting party or the subjective interpretations of the searching officer." State v. Troxell, 78 S.W.3d 866, 871-72 (Tenn. 2002). Instead, the objective standard of a reasonable person is applied in determining the scope of consent. Id. at 872.

In this instance, Ms. Cotton initiated contact with the police after her home was burglarized, and she cooperated during the search of her residence for any evidence that may have identified the perpetrator. The trial court credited Officer Shabazz's testimony that Ms. Cotton never placed any limitations on the search or withdrew her consent to the search. Based on our review, we conclude that the trial court did not err in denying Defendant's motion to suppress the AK-47 rifle and banana clips found in Ms. Cotton's apartment. Defendant J. C. Fair is not entitled to relief on this issue.

## IV. Evidentiary Ruling

Defendant J. C. Fair argues that the trial court erred in allowing the weapon found in Ms. Cotton's apartment to be introduced into evidence because its physical appearance did not match Ms. Johnson's trial testimony of the weapon used during the robbery. The weapon found in Ms. Cotton's apartment did not have a strap attached and the stock was missing. As such, Defendant contends that the weapon was not relevant to a material issue at trial. Alternatively Defendant contends that any probative value of the evidence was substantially outweighed by the danger of unfair prejudice. See Tenn. R. Evid. 401, 403.

At trial, the State initially introduced the weapon for identification purposes only without a contemporaneous objection by Defendant J. C. Fair. Defendant J. C. Fair's counsel then

-11-

cross-examined Ms. Johnson extensively as to the differences between the weapon she observed during the robbery and the weapon found in Ms. Cotton's apartment. During Officer Shabazz's direct testimony, the State moved to introduce the weapon as an exhibit at trial, again without objection by Defendant J. C. Fair. Trial counsel for Defendant Krederick Fair, however, did object, and his objection was overruled by the trial court. Defendant Krederick Fair does not appeal this ruling.

Failure to contemporaneously object to the introduction of an exhibit at trial constitutes waiver of this issue for purposes of appeal. Tenn. R. App. P. 36(a); see State v. Antonio George, No. E2005-02013-CCA-R3-CD, 2006 WL 3371238, at *9 (Tenn. Crim. App., at Knoxville, Sept. 26, 2006), no. perm. to appeal filed (concluding that the defendant had waived his issue concerning the admissibility of evidence notwithstanding objection by his co-defendant's counsel). Moreover, waiver aside, we conclude that Defendant is not entitled to relief on this issue.

Tennessee Rule of Evidence 401 provides that "'[r]elevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. " Generally, relevant evidence is admissible, while irrelevant evidence is inadmissible. Tenn. R. Evid. 402. However, relevant evidence may be excluded if its probative value is "substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." Tenn. R. Evid. 403. "The admissibility of evidence under Rule 403 of the Tennessee Rules of Evidence is a matter within the trial court's discretion and will not be reversed on appeal absent an abuse of that discretion." State v. Biggs, 218 S.W.3d 643, 667 (Tenn. Crim. App. 2006) (citing State v. Dubose, 953 S.W.2d 649, 652 (Tenn. 1997)).

Both Defendants were charged with aggravated robbery which required the State to prove that the offense was committed with a deadly weapon. See T.C.A. § 39-13-402(1). Ms. Johnson testified that an AK-47 rifle was used during the offense. An AK-47 rifle was found in Defendant J. C. Fair's apartment the day after the robbery. The trial court found that the evidence was relevant, and any discrepancy between Ms. Johnson's description at trial of the weapon used during the robbery, and the actual weapon recovered went to the weight the jury may choose to assign the evidence. Based on our review, we conclude that the trial court did not err in admitting the AK-47 weapon into evidence as an exhibit. Defendant J. C. Fair is not entitled to relief on this issue.

## V. Sufficiency of the Evidence

Both Defendants challenge the sufficiency of the convicting evidence, essentially focusing on Ms. Johnson's credibility. It was Defendants' theory at trial that Ms. Johnson planted the AK-47 in Ms. Cotton's apartment. Defendants point to the fact that Officer Shabazz testified that there was no sign of forced entry, and the apartment had not been ransacked, which testimony was contrary to Ms. Johnson's testimony. Defendants also submit that Ms. Johnson had keys to all of the apartments, and the weapon was found just hours after police officers arrested J. C. Fair and throughly searched the apartment for weapons to no avail. Additionally, Defendant J. C. Fair points to other inconsistencies in Ms. Johnson's testimony such as her initial description of the perpetrator as a man wearing a tee shirt and blue jeans.

When a defendant challenges the sufficiency of the convicting evidence, we must review the evidence in a light most favorable to the prosecution in determining whether a rational trier of fact could have found all the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979). Once a jury finds a defendant guilty, his or her presumption of innocence is removed and replaced on appeal with a presumption of guilt. State v. Black, 815 S.W.2d 166, 175 (Tenn. 1991). The defendant has the burden of overcoming this presumption, and the State is entitled to the strongest legitimate view of the evidence along with all reasonable inferences which may be drawn from that evidence. Id.; State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). The jury is presumed to have resolved all conflicts and drawn any reasonable inferences in favor of the State. State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984). Questions concerning the credibility of witnesses, the weight and value to be given the evidence, and all factual issues raised by the evidence are resolved by the trier of fact and not this court. State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). These rules are applicable to findings of guilt predicated upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. State v. Matthews , 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990).

A conviction for aggravated robbery, as indicted in this case, requires proof beyond a reasonable doubt that the defendant committed an "intentional or knowing theft of property from the person of another by violence or putting the person in fear . . . accomplished with a deadly weapon." T.C.A. § 39-13-402(a)(1). A person is criminally responsible for the conduct of another if, "[a]cting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the person solicits, directs, aids, or attempts to aid another person to commit the offense." T.C.A. § 39-11-402(2).

Viewing the evidence in a light most favorable to the State, Ms. Johnson testified that Defendant J. C. Fair telephoned her to ascertain whether she was alone in the office. Defendant J. C. Fair arrived shortly thereafter and made a partial payment toward his past due rent. Ms. Johnson saw an individual wearing a jacket and skirt arrive at the office door. Ms. Johnson opened the door, and the individual entered the office, pointed an AK-47 at Ms. Johnson, and directed her to go into the office. The individual took Ms. Johnson's purse and the deposit bag containing approximately $3,000 in cash. Ms. Johnson testified that she was very afraid during the offense. Ms. Johnson identified Defendant Krederick Fair, Defendant J. C. Fair's brother, as the man who held the rifle on her and took the cash receipts from her office. Ms. Johnson testified that Defendant J. C. Fair wiped off the doorknob of the office's back door, through which Defendant Krederick Fair had exited, with his tee shirt, and then closed the back door with his tee shirt. An AK-47 with its strap and stock missing was found in Defendant J. C. Fair's apartment the following day.

It was the jury's prerogative to resolve any inconsistencies in Ms. Johnson's testimony and assess her credibility. It was also the jury's prerogative to consider the evidence presented concerning the facts and circumstances surrounding the discovery of the weapon in Ms. Cotton's apartment. Based on our review, we conclude that a rational trier of fact could find beyond a reasonable doubt that Defendant Krederick Fair was guilty of committing the offense of aggravated robbery, and Defendant J. C. Fair was guilty of aggravated robbery under a theory of criminal responsibility. Defendants are not entitled to relief on this issue.

## VI. Jury Instructions

Both Defendants argue that the trial court erred in its instructions to the jury on the offense of facilitation of aggravated robbery as well as facilitation of the lesser included offenses of aggravated robbery.

The trial court instructed the jury concerning the elements of aggravated robbery, robbery, aggravated assault, theft of property, and assault. The trial court then instructed:

> Any person who commits the offense of facilitation of a felony is guilty of a crime. For you to find the defendant guilty of this offense, the State must have proven beyond a reasonable doubt the existence of the following essential elements: that the defendant knew that another person intended to commit a specific felony but did not have the intent to promote or assist the commission of the offense or to benefit in the proceeds or results of the offense; that the defendant furnished substantial assistance to that person in the commission of the felony; and that the defendant furnished such assistance knowingly.

Defendants argue that the trial court's generic instruction on facilitation, without referencing a specific felony, misled the jury and did not fairly submit the legal issues. Defendants point to the fact that during deliberations, the jury posed two questions on separate occasions which, in Defendants' views, highlight the jury's confusion over the facilitation instruction.

In criminal cases, a defendant has a right to a correct and complete charge of the law. State v. Garrison, 40 S.W.3d 426, 432 (Tenn. 2000). The failure to do so deprives the defendant of the constitutional right to a jury trial and subjects the erroneous jury instruction to harmless error analysis. Id. at 433-34. A jury instruction is considered "prejudicially erroneous if it fails to fairly submit the legal issues or if it misleads the jury as to the applicable law." State v. Hodges, 944 S.W.2d 346, 352 (Tenn. 1997). In evaluating claims of error in the jury charge, this court must review the charge in its entirety and read it as a whole. State v. Leach, 148 S.W.3d 42, 58 (Tenn. 2004).

A panel of this Court recently concluded that a jury instruction like the one provided by the trial court in the case sub judice did not fail to fairly submit the legal issues or mislead the jury. State v. Latisha Jones, No. W2005-02673-CCA-R3-CD, 2007 WL 241023, at *9 (Tenn. Crim. App., at Jackson, Jan. 25, 2007). Moreover, as in Latisha Jones, the trial court in the present case further instructed the jury that if they did not find the defendant guilty of aggravated robbery then they were to proceed to consider the lesser included offenses of facilitation of aggravated robbery, robbery, facilitation of robbery, aggravated assault, facilitation of aggravated assault, theft of property, facilitation of theft of property, and assault.

During deliberations, the jury first asked, "please define facilitation of aggravated robbery." The trial court reread to the jury the previously provided instruction on facilitation. On the next occasion, the jurors wrote, "there is no definition of facilitation of aggravated robbery." The trial court explained:

-14-

and the general statute that I read to you says that in the body that I just read to you says that the defendant knew that another person intended to commit a specific felony. Well, the crime of facilitation of a felony is facilitation of the specific felony. So when I define for you facilitation of aggravated robbery, it would mean that the defendant knew that another person intended to commit an aggravated robbery but did not have the intent to promote. The definition of aggravated robbery is included in here.

The trial court repeated this explanation as to each of the lesser included offenses, and clearly explained the elements of facilitation as to each specific offense included in the indictment. The jurors indicated that they understood.

Based on our review of the jury instructions in their entirety, we conclude that the instructions by the trial court fairly submitted the legal issues and did not mislead the jury. Defendants are not entitled to relief on this issue.

## VII. Denial of Mistrial based on Prosecutorial Misconduct

It was Defendants' theory at trial that Ms. Johnson's testimony was unreliable, and suggested during closing arguments that Ms. Johnson "pinned" the robbery on Defendants and had the opportunity and motive to plant evidence against them, that is, the AK-47 rifle. In response to Defendants' closing argument, the State noted in rebuttal that:

[n]o one is really – sounds like question[ing] her ability to identify that man. And she stood here in court and said that's the man that robbed me, all right. But it sounds like, if I'm hearing this right, that she's trying to set them up. Is that what I'm hearing? Because they've got it backwards. They set her up. Is she framing them? Think how stupid that is. Think how just on its face how stupid that is.

The State argued that if Ms. Johnson had intended to make up a fictitious robbery, she could have described the assailants anyway she chose, and then the alleged perpetrators would never be found. The State submitted, "Their whole theory of the case is just patently stupid. It's stupid."

At the close of the State's argument, Defendant Krederick Fair's trial counsel asked permission to approach the bench and the following colloquy occurred:

[TRIAL COUNSEL]:        Your, Honor, I move for a mistrial. That rebuttal argument was completely improper. It characterized us in a disparaging way. It thought it was borderline unethical and I move for a mistrial.

THE COURT:        Well, I'm not going to grant a mistrial, and I think it was a little forceful but I don't think it was directed at attorneys. I think it was directed at the defense theory. I'll note your exception.

-15-

[TRIAL COUNSEL]:          Thanks, Judge.

The bench conference concluded without trial counsel requesting a curative instruction, and the judge proceeded to instruct the jury.

Initially, we observe that neither Defendant J. C. Fair nor Defendant Krederick Fair contemporaneously objected to the State's comments. See Tenn. R. App. P. 36(a); State v. Reid, 164 S.W.3d 286, 346 (Tenn. 2005) (noting that failure to make a contemporaneous objection to the prosecutor's comments during closing argument constituted waiver of the issue for purposes of appellate review). Thus, Defendant J. C. Fair has waived appellate review of this issue. However, Defendant Krederick Fair, despite the absence of a contemporaneous objection, did move for a mistrial after the completion of the State's closing argument.

A mistrial should be declared in a criminal trial only in the event of a "manifest necessity" that requires such action. State v. Hall, 976 S.W.2d 121, 147 (Tenn. 1998). "The purpose for declaring a mistrial is to correct damage done to the judicial process when some event has occurred which precludes an impartial verdict." State v. Williams, 929 S.W.2d 385, 388 (Tenn. Crim. App. 1996). The determination of whether to grant a mistrial rests within the sound discretion of the trial court. State v. Smith, 871 S.W.2d 667, 672 (Tenn. 1994). The reviewing court should not overturn that decision absent an abuse of discretion. State v. Reid, 91 S.W.3d 247, 279 (Tenn. 2002). In this case, the trial judge found there was no manifest necessity requiring a mistrial. We agree.

Our supreme court has recognized that closing argument is a valuable privilege for both the State and the defense, and that counsel is afforded wide latitude in presenting final argument to the jury. See State v. Cribbs, 967 S.W.2d 773, 783 (Tenn. 1998). However, a party's closing argument "must be temperate, predicated on evidence introduced during the trial of a case, and must be pertinent to the issues being tried." State v. Middlebrooks, 995 S.W.2d 550, 568 (Tenn. 1999). A party "must be given the opportunity to argue not only the facts in the record but any reasonable inferences therefrom." Id. (citing Russell v. State, 532 S.W.2d 268, 271 (Tenn. 1976)).

It has long been recognized that the "prosecution is not permitted to reflect unfavorably upon defense counsel or the trial tactics employed during the course of the trial." State v. Gann, 251 S.W.3d 446, 460 (Tenn. Crim. App. 2007) (citations omitted). A prosecutor is permitted, however, to comment on the strength and believability of the defense theories. Hall, 976 S.W.2d at 158 (finding no abuse of discretion in the trial court overruling the defendant's objections to the State's closing comments such as "'that's not a reasonable alternative,'" and "'such a ridiculous position'").

The State's comments were made directly in response to the Defendants' closing arguments which questioned Ms. Johnson's motivation during the sequence of events leading up to the charged offense. The trial court explained to the jury before closing arguments that the arguments of counsel are not evidence. Based on our review, we conclude that the trial court did not abuse its discretion in finding no "manifest necessity" which would warrant a mistrial. Defendant Krederick Fair is not entitled to relief on this issue.

## VIII. Denial of Mistrial Based on Improper Testimony

Defendant J. C. Fair argues that the trial court erred in denying his request for a mistrial based on Ms. Johnson's references during her cross-examination to his prior incarceration. At trial, the following exchange occurred:

[J. C. FAIR'S COUNSEL]:    And [Defendant J. C.] Fair is dating Qartisha and that's how you met him?

[MS. JOHNSON]:    Right. Very good guy, at least I thought.

[J. C. FAIR'S COUNSEL]:    And he moved in to the Lincoln Apartments, right?

[MS. JOHNSON]:    He did and in a particular three bedroom unit and he ended up going to jail and a – well, I'm sorry. I'm not supposed to –

The trial court conducted a bench conference in the presence of but out of the hearing of the jury during which the following colloquy occurred:

[J. C. FAIR'S COUNSEL]:    I didn't ask any reference – any reference to him going to jail or anything like that, the jury disregard that. I mean, that's highly prejudicial.

THE COURT:    You've lost me.

[J. C. FAIR'S COUNSEL]:    Any reference to him going to jail or any kind of criminal record whatsoever, I think that's highly prejudicial.

THE COURT:    I thought she was talking about this time.

[K. FAIR'S COUNSEL]:    No.

[J. C. FAIR'S COUNSEL]:    No, she's talking about that prior, prior.

THE COURT:    Well, I didn't –

[K. FAIR'S COUNSEL]:    He asked a question how you know Quartisha Cotton and she rambled into well[,] he had just gone to jail.

THE COURT:    I mean, I didn't understand it to be that but I'll tell the jury if you want me –

[K. FAIR'S COUNSEL]:    Maybe they didn't understand it. If he instructs them, they'll certainly understand it.

-17-

| | |
|---|---|
| [J. C. FAIR'S COUNSEL]: | Yeah. |
| THE COURT: | Okay. |

The bench trial was concluded and Ms. Johnson's cross-examination resumed:

| | |
|---|---|
| [J. C. FAIR'S COUNSEL]: | So you met [Defendant J. C.] Fair through Quartisha. And [Defendant J. C.] Fair was a good resident? |
| [MS. JOHNSON]: | Yes, he was a very good little fellow. |
| [J. C. FAIR'S COUNSEL]: | Okay. He – in fact, he donated a TV to the clubhouse, correct? |
| [MS. JOHNSON]: | No, he actually didn't donate it. [Defendant] J. C. [Fair] got ready to go to jail, and he wanted me to buy the TV from him. |
| THE COURT: | All right. Ladies and gentlemen, could I ask you to step to your jury room for just a minute, please. |

During the hearing out of the presence of the jury, the trial court requested that trial counsel repeat his question to Ms. Johnson. In response to trial counsel's question concerning whether Defendant J. C. Fair had donated a television to the clubhouse, Ms. Johnson stated, "No, he got ready to go to jail for some charges that he had gotten for – if I'm not mistaken, robbery or drugs or something he told me and he sold the TV to us to pay his rent."

The trial court agreed to give a curative instruction to the jury but observed that it did not feel that Ms. Johnson's answer was unresponsive to trial counsel's question. Both Defendants moved for a mistrial, which motion was denied by the trial court. The trial court then instructed the jury as follows:

> Ladies and gentlemen, there was some reference in Ms. Johnson's testimony about [Defendant] J. C. Fair going to jail for something that is not connected with this case whatsoever. My instructions to you are that has absolutely no bearing on this case at all. You're not to consider it for anything. It has no bearing with regard to the facts of this case. You're to try this case based upon the evidence and the facts that deal with this case, and any reference to anything else other than that along the lines of some kind of incarceration for any reason whatsoever has no bearing on this case. Does everybody understand that? You may continue.

As previously noted, the decision of whether or not to grant a mistrial rests within the sound discretion of the trial court. Smith, 871 S.W.2d at 672. A manifest necessity for a mistrial exists when there is "no feasible alternative to halting the proceedings." State v. Knight, 616 S.W.2d 593, 596 (Tenn. 1981). When determining whether a mistrial is necessary after a witness had injected

-18-

improper testimony, this Court has often considered the following factors: (1) whether the improper testimony resulted from questioning by the state or was it a gratuitous declaration, (2) the relative strength or weakness of the state's case, and (3) whether the trial court promptly gave a curative instruction. State v. Terrez Talley, Jevon Bryant, and Keith Ezell, No. W2003-02237-CCA-R3-CD, 2006 WL 2947435, at *13 (Tenn. Crim. App., at Jackson, October 16, 2006), perm. to appeal denied (Tenn. Mar. 19, 2007) (citing State v. Larry Holmes, No. W2004-01576-CCA-R3-CD, 2005 WL 1656830, at *10 (Tenn. Crim. App., at Jackson, July 15, 2005), perm. to appeal denied (Tenn. Dec. 19, 2005); State v. Paul Hayes, No. W2001-02637-CCA-R3-CD, 2002 WL 31746693, at *4 (Tenn. Crim. App., at Jackson, Dec. 6, 2002), perm.to appeal denied (Tenn. May 27, 2003)).

As for the first factor, neither of Ms. Johnson's statements were elicited by the State. Ms. Johnson's first statement was gratuitously made, and Defendants decided not to have the trial court issue a curative instruction. As the trial court indicated, it was not clear whether Ms. Johnson was referring to Defendant J. C. Fair being confined because of his arrest for the current charge or for a prior charge. The second statement was made in response to trial counsel's question as to whether Defendant J. C. Fair had donated a television set to the Lincoln Apartment's clubhouse. Under the second factor, we note that the State's case rested primarily on Ms. Johnson's eyewitness identification of Defendants' participation in the robbery and her trial testimony. Nonetheless, the trial court gave a prompt curative instruction to the jury, and juries are presumed to follow the trial court's instructions. State v. Banks , 271 S.W.3d 90, 134 (Tenn. 2008) (citing State v. Young, 196 S.W.3d 85, 111 (Tenn. 2006); State v. Shaw, 37 S.W.3d 900, 904 (Tenn. 2001)); see also State v. Hall, 947 S.W.2d 181, 184 (Tenn. Crim. App. 1997) (holding that improper testimony about the defendant's prior incarceration did not create a manifest necessity for a mistrial because the trial court gave a prompt curative instruction); State v. Williams, 929 S.W.2d 385, 388 (Tenn. Crim. App. 1996) (holding that improper testimony about defendant's prior bad acts did not create a manifest necessity for a mistrial because trial court gave an immediate curative instruction).

Based on our review and under these circumstance, we conclude that the trial court did not err by denying Defendant J. C. Fair's request for a mistrial. Defendant is not entitled to relief on this issue.

## CONCLUSION

After a thorough review, we affirm the judgments of the trial court.

_____
THOMAS T. WOODALL, JUDGE

-19-